IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY WINKELMAN, *et al.*, | ) | CASE NO. 1:07 CV 3860 |
| | ) | |
| Plaintiffs, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| PARMA CITY SCHOOL DISTRICT | ) | |
| BOARD OF EDUCATION, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

## Introduction

Before me by referral[1] are cross-motions for summary judgment/judgment on the

administrative record.[2] The underlying case involves an administrative appeal under the

Individuals with Disabilities Education Act (IDEA)[3] taken by the plaintiffs Jeffrey and

---

[1] ECF # 10.

[2] Plaintiffs' motion is styled as a motion for summary judgment (ECF # 44) and defendant's motion is captioned as a motion for judgment on the administrative record (ECF # 46). As will be discussed later, the appropriate form here is a motion for judgment on the administrative record.

[3] 20 U.S.C. § 1400, *et seq.* The terminology is yet another area where the parties are not in precise agreement. The Winkelman's brief refers to the pertinent statute as the Individuals with Disabilities Education Act (IDEA), *see*, ECF # 47 at 1, while Parma's brief cites to the Individuals with Disabilities Education Improvement Act (IDEIA), *see*, ECF # 46 at 1. The IDEIA, which generally amended the IDEA, was enacted in 2004 and took effect on July 1, 2005. *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 506 n.2 (2d Cir. 2006). The amended act itself continues to state that it may be cited as the "Individuals with Disabilities Education Act," 20 U.S.C. § 1400(a). Moreover, this Court, in prior decisions involving these parties, has previously referred to the applicable statute as the IDEA. *See*, *Winkelman v. Parma City School Dist.*, No. 1:08-cv-2135, 2009 WL 1444441, at * 1 (N.D. Ohio, May 22, 2009) (Nugent, J.). Accordingly, the references here will be to the IDEA, as amended.

Sandee Winkelman (the Winkelmans) in their capacity as parents of a school-aged son, J.W.,[4] who has autism. The Winkelmans, residents of the Parma City School District (Parma), here assert that Parma violated their rights under the IDEA and/or those of their son in two major respects:

> (1)     that two separate decisions of State Level Review Officers (SLROs) of the Ohio Department of Education erroneously found that for three school years Parma did offer J.W. a free appropriate public education (FAPE) as required by the IDEA;  and
>
> (2)     that these two decisions also improperly denied the Winkelmans reimbursement for expenses incurred in educating J.W. during those three years at Monarch School, a private institution in Shaker Heights, Ohio.

For the reasons that follow, I will recommend that Parma's motion be granted.

## Facts

This is a well-known case with an extensive history created over many proceedings. Accordingly, there seems little value here in attempting to comprehensively summarize such a voluminous record. A brief factual review of the events relevant to this motion is appropriate, however.  Of necessity, even such a review taxes the notion of brevity. Inasmuch as the individual administrative cases at issue here center on three specific school years, I will likewise group the facts presented by the individual school year at issue, beginning with some consideration of events that transpired prior to the first school year here under review.

---

[4] The identity of the Winkelmans' son is made explicit in other proceedings of this case, but is partially concealed by the use of initials here.  I have chosen for the sake of consistency to use the form – the initials – that both parties have adopted in this case.

-2-

A.    **Prior events**

Prior to entering school for the first time, Parma identified the Winkelmans' son, J.W., as having autism and so eligible for special education services under IDEA.[5] Based on that determination, Parma developed an Individualized Education Program (IEP) for J.W. under which he then was enrolled in the First Step Preschool program in the Parma schools for the 2000-01 school year.[6]

By the end of that school year, however, the IEP team responsible for J.W., which included his parents as well as Parma teachers, concluded that J.W. could no longer receive a FAPE at First Step in Parma but that he should enroll for the next year at the Achievement Center for Children (ACC), a private preschool for autistic children.[7]  Parma funded J.W.'s placement at ACC under the IDEA.[8]  Under the IEP created by Parma, J.W. attended the ACC, with his expenses paid by Parma, during the 2001-02 and 2002-03 school years, as well as during the summers of 2002 and 2003.[9]

In the summer of 2003, however, the pre-school program at the ACC concluded and that school discharged J.W., with responsibility for his future public education returning to

---

[5] ECF # 22 (Opinion of IHO Mazzola) (factual findings) at ¶ 12.

[6] ECF # 44 at 4.  (All citations in this Facts section to a brief prepared by a party are to a page therein which also cites to a transcript from one of the underlying proceedings. Unless otherwise required, I will cite to the page in the brief with the citation, but not to both the page and record citation.)

[7] *Id*.

[8] *Id*.

[9] *Id.*, *see also*, ECF # 22 (Mazzola Opinion) (factual findings) at ¶ 13.

Parma.[10]  At this time, Parma continued to identify J.W. as disabled and eligible for special education services related to his autism.[11]  Thus, in June, 2003 the Winkelmans and Parma met to establish a new IEP for J.W. for the upcoming school year when he was presumably to attend school in Parma.

The IEP prepared for J.W. at this time, to be presented at a June 2, 2003 meeting between Parma and the Winkelmans, provided for placement in a self-contained special education classroom for K-2 students at Parma's Pleasant Valley Elementary School.[12]  The Winkelmans, however, disagreed with that placement and with the IEP.  They immediately filed a due process complaint with a request that, pending completion of the due process hearing, J.W.'s stay-put placement should either remain the ACC preschool or, alternatively, change to the Monarch School in Shaker Heights, another private institution.[13] While the Winkelmans' due process hearing request pended,[14] J.W. continued to attend the ACC preschool on an extended summer schedule, and Parma continued to pay the expenses.[15]

---

[10] *Id.*

[11] ECF # 44 at 5; ECF # 46 at 2.

[12] *Id.*

[13] ECF # 44 at 5.

[14] This due process complaint was ultimately unsuccessful.

[15] ECF # 44 at 5.

The IEP offered by Parma for 2003-04 was found by both the state hearing officers[16] and by this Court[17] to provide J.W. with a FAPE.  However, that IEP was never implemented since J.W. was never enrolled in Parma for that year.[18]  Instead, the Winkelmans elected prior to the start of the school year to enroll J.W. in Monarch School.[19]

As noted, these prior events, while useful for context, are merely prologue to the circumstances giving rise to the present action.  Those events will, as mentioned, be grouped below according to the relevant school year at issue.

**B.     2004-05 school year**

The pertinent events of the 2004-05 school year as concern this case need to be understood in light of the Winkelmans two basic arguments arising out of this year and Parma's responses.   For the Winkelmans, 2004-05 is a year that:

(1)     the district did not have an IEP in place for J.W. at the start of that year, and

(2)     the district denied them a meaningful opportunity to participate in creating an IEP.

For Parma, 2004-05 is characterized by:

(1)     the Winkelmans refusal to participate in any meetings arranged by Parma prior to the school year to create an IEP and then,

---

[16] *Winkelman v. Parma City School District*, 411 F. Supp. 2d 722, 726 (N.D. Ohio 2005); *aff'd after remand*, 294 F. App'x. 997 (6th Cir. 2008); *cert. den*. 129 S. Ct. 2862 (2009).

[17] *Winkelman*, 411 F. Supp. 2d at 734.

[18] *Id*. at 725-26.

[19] *Id.*

(2)     after such refusals, playing "gotcha" with the district by attacking Parma for not having an IEP in place at the start of the school year.

Notwithstanding the opposing characterizations, the essential underlying facts appear undisputed.[20]

On May 27, 2004, prior to the beginning of the 2004-05 school year, Parma sent the Winkelmans a letter requesting attendance at an IEP meeting to "review J.W.'s progress and develop an IEP for the 2004-2005 school year."[21]  The Winkelmans did not respond to this letter.[22]  On July 15, 2004, approximately two months after the first letter and also prior to the beginning of the school year, Parma sent the Winkelmans a second letter "requesting that the Winkelmans meet with [Parma] to consider the educational program available at Parma."[23]  Once again, the Winkelmans did not respond to Parma's letter.[24]

The school year then began on August 23 with three significant, undisputed events:

(1)     Parma did not have an IEP in place for J.W.;[25]

---

[20] I note that SLRO Mues's opinion stated that the facts found by the IHO as concerns the two school years at issue were supported by the record.  ECF # 27 (IHO Mues opinion) at 4.  The issue on review was not with the facts themselves but, rather, whether the facts supported the conclusions of the IHO.  *Id.*  Here, although the Winkelmans attempt to raise arguments as to how some facts were stated in the state record (*see*, *e.g.*, Parma's summary of these objections at ECF # 48 at 2-4), I recommend finding, as Parma contends, that the Winkelmans have pointed to nothing in the state record that precludes the IHO's specific findings or compels contrary findings.  ECF # 48 at 2.

[21] ECF # 22 (Mazzola Opinion) (factual findings) at ¶ 32.

[22] *Id.*

[23] *Id.* at ¶ 33.

[24] *Id.* at ¶ 34.

[25] *Id.* at ¶ 35.

(2)    Parma received a federal court order that day affirming a decision of an Ohio SLRO that Pleasant Valley School in Parma was J.W.'s stay-put placement[26] despite the Winkelmans having previously requested an order designating Monarch School as J.W.'s stay-put placement;[27] and

(3)    Parma did not send a bus for J.W. on the first day of school.[28]

Upon receiving notice on August 24 confirming J.W.'s stay-put placement at Pleasant Valley, Parma sent yet another letter to the Winkelmans inviting them to attend a "preliminary IEP meeting" on September 2, as well as "a formal 'Parent Invitation' to the IEP meeting."[29]

Within days of this invitation, the Winkelmans filed a due process request alleging denial of a FAPE because Parma did not have an IEP in place on the first day of school[30] and asked Parma to reschedule the IEP meeting.[31] Parma, in response to the Winkelmans' request to reschedule, sent the Winkelmans a second parent invitation, proposing to have the IEP team meeting on either September 13 or 15.[32]  That invitation included a draft IEP for the Winkelmans to review.[33]

---

[26] *Id.,* at ¶ 29.

[27] *Id.* at ¶ 25; *see also*, ECF # 46 at 3.

[28] ECF # 44 at 7.

[29] ECF # 22 (Mazzola Opinion) (factual findings) at ¶ 36.

[30] *Id.* at ¶ 37. This due process complaint was later withdrawn in October, 2004. ECF # 44 at 7; ECF # 46 at 4 n4.

[31] *Id.* at ¶ 38.

[32] *Id.* at ¶ 39.

[33] *Id.*

A few days later, Mrs. Winkelman asked Parma to reschedule the IEP meeting, proposed for either September 13th or 15th, to the 20th.[34]  Parma agreed and thereupon mailed the Winkelmans a third invitation to an IEP meeting, now rescheduled for the 20th.[35] Mrs. Winkelman responded to Parma's third invitation to an IEP meeting by notifying Parma that the Winkelmans now wanted the IEP meeting planned for the 20th moved to an unspecified future date so that all parties could know how the IHO had ruled on their request for a stay-put order concerning J.W.– a decision the Winkelmans expected to be issued either the 20th or 21st.[36]  Parma never responded to this letter.[37]

During the morning of the 20th and prior to the originally scheduled IEP meeting, the IHO issued the stay-put order finding that Pleasant Valley in Parma was J.W.'s stay-put placement.[38]  When Parma's attempt that day to contact the Winkelmans about proceeding with the meeting did not succeed,[39]  Parma decided to go forward with the meeting as scheduled without the Winkelmans.[40]  Accordingly, those present prepared an IEP for J.W. at that meeting.  The members of the IEP team from Parma signed the IEP, and Parma

---

[34] *Id.* at ¶ 43.

[35] *Id.* at ¶ 44.

[36] *Id.* at ¶ 45.

[37] *Id.* at ¶ 46.

[38] *Id.* at ¶¶ 47-48.

[39] *Id.* at ¶ 48.

[40] *Id.* at ¶ 49.

transmitted it to the Winkelmans on September 21, along with a written notice of what transpired at the meeting and an invitation to meet again to review the plan.[41]

The Winkelmans made no direct response to these communications and "did not ask to revisit the September 20, 2004 [IEP] pursuant to [Parma's] invitation."[42]   Instead, in correspondence dated the 20th – which, as noted, is the date of the order confirming J.W.'s stay put placement as Pleasant Valley, as well as the date the IEP meeting was held – Mrs. Winkelman informed Parma that she would be "'providing educational services for J.W. at home.'"[43]

After this representation, Parma, on September 24, notified the Winkelmans of its withdrawal of the prior written notice communication about the IEP and informed them of the home schooling requirements applicable to J.W.[44]   Within two weeks, Parma sent the Winkelmans yet another letter about home schooling, which included information as to J.W.'s attendance record and another copy of the home schooling requirements.[45] The Winkelmans did not contemporaneously respond to these communications nor did they file an application to have J.W. home schooled.[46]

---

[41] *Id.* at ¶ 51.

[42] *Id.* at ¶ 52.

[43] *Id.* at ¶ 53, quoting the letter.

[44] ECF # 46 at 6.

[45] *Id.*

[46] *Id.*

Despite a brief exchange of emails in November, 2004, apparently generated in response to another request by Parma for information as to where J.W. was being educated, the Winkelmans did not apply to have J.W. home schooled during the 2004-05 school year.[47] In the end, the Winkelmans did not enroll J.W. at Parma. Rather, working with the assistance of the Monarch School,[48] they educated him at home during the 2004-05 school year.[49]

## C.    2005-06 school year

On July 28, 2005, in advance of the 2005-06 school year, Parma sent a letter to the Winkelmans inviting them to an IEP meeting on August 18 for the forthcoming school year.[50] In advance of that meeting, Mrs. Winkelman provided Parma with information as to J.W.'s current educational performance.[51]

At the lengthy[52] IEP meeting on August 18 – which was attended by the Winkelmans and team members from Parma[53] – Parma presented a draft IEP, which was then discussed,

---

[47] *Id*. at 7.

[48] ECF # 44 at 7.

[49] *Id*.  J.W. apparently did attend Monarch for "a brief period" in December, 2004. *See*, *id.*

[50] ECF # 22 (Mazzola Opinion) at ¶ 54.

[51] *Id*. at ¶ 55.

[52] *Id*. at 8. Parma represents in its brief that the meeting lasted four and a half hours.

[53] In addition to IEP team members invited by each party, Parma's attorney was also present over the objections of the Winkelmans.  ECF # 22 (Mazzola Opinion) (factual findings) at ¶ 56.

and numerous changes made.[54]  At the conclusion of the meeting, the Winkelmans signed the IEP as only participants.[55]

As this IEP meeting was concluding, however, the Winkelmans expressed an interest in using the Autism Scholarship Program (ASP).[56]  During an ensuing discussion about the ASP, a disagreement surfaced as to whether parents qualified for the program if litigation over any previous IEP remained pending.  The Ohio Department of Education was immediately contacted by phone to clarify the eligibility rules for the ASP.[57]  Upon being told by a state official that "a student was only eligible for the ASP if there was no litigation pending concerning any IEP that had been developed for the child,"[58] the Winkelmans "abruptly left the meeting,"[59] professing their disagreement with this position.[60]

In addition, "[b]ecause the meeting ended abruptly, documents necessary to implement related transportation services were not completed at the end of the meeting."[61]

---

[54] ECF # 22 (Mazzola Opinion) (factual findings) at ¶¶ 58, 59.

[55] *Id.* at ¶ 60.  Signing as "Attendance Only" is an option when presented with an IEP with which parents do not agree.

[56] *Id.* at ¶ 61.  The ASP is a program of the Ohio Department of Education by which parents who qualify receive state funds, similar to a voucher, to pay their child's tuition at a special education program other than the one operated by their school district of residence. *See*, Ohio Rev. Code § 3310.41.

[57] *Id.* at ¶¶ 62-65.

[58] *Id*. at ¶ 67.

[59] *Id*. at ¶ 68.

[60] *Id*.

[61] *Id*. at ¶ 69.

Moreover, in "the confusion caused by the contentious end to the [IEP] meeting,"[62] Parma "wasn't sure whether or not [the Winkelmans]" had agreed to the IEP[63] and so "assumed without confirming" that J.W. would not be attending Pleasant Valley in the upcoming year.[64]  Significantly, this confusion by Parma about the Winkelmans' intentions as to enrolling J.W. at Pleasant Valley also caused Parma to make no arrangement for bus transportation for J.W. for the first day of school.[65]

Given this history, on August 23, the first day of school, Parma did not send a bus for J.W,[66] ironically despite the fact that the Winkelmans had themselves decided to "put J.W. on the bus to Pleasant Valley" pending a determination of their ASP request.[67]  Instead, the Parma superintendent phoned Mrs. Winkelman on the first day of school to say that the IEP discussed at the August meeting was not being implemented because it had not been agreed to.[68]  Mrs. Winkelman thereupon took J.W. to Monarch that afternoon.[69]

---

[62] *Id*. at 40.

[63] *Id*. at ¶ 70.

[64] *Id*. at ¶ 71.

[65] *Id*.

[66] *Id*.

[67] *Id*. at ¶ 73.

[68] *Id*. at ¶ 74.

[69] *Id*. at ¶ 75.

Parma did send a bus for J.W. the next day, but Mrs. Winkelman refused to put J.W.

on that bus.[70] Instead, the next day the Winkelmans informed Parma that, for the 2005-06

school year, "'J.W. will be attending Monarch school at the public expense.'"[71]

A few months later, the Winkelmans, who ultimately did not succeed in obtaining a

state autism scholarship for the school year,  told Parma in November, 2005, that they were

withdrawing approval of J.W.'s IEP for that year.[72]  In the end, J.W. did not attend Pleasant

Valley[73] but, rather, attended Monarch[74] and so the 2005-06 IEP developed with Parma was

never implemented.

At the close of this school year, the Winkelmans filed a due process complaint, which

is under review here, alleging that Parma had denied J.W. a FAPE for school years 2004-05

and 2005-06.  The IHO ruled for Parma and against the Winkelmans concerning  both school

years,[75] and these decisions were later substantially affirmed by the SLRO.[76]

---

[70] ECF # 27 (SLRO Mues opinion) at 9.

[71] ECF # 46 at 9-10, quoting Winkelman letter.

[72] *Id*. at 10.

[73] In fact, IHO Mazzola found that the Winkelmans signed a tuition contract with Monarch for this school year and paid under that contract.  ECF # 22 (Mazzola Opinion) (factual findings) at ¶ 77.

[74] See, ECF # 27 (Taich Opinion) at 9.

[75] ECF # 22 (Mazzola Opinion) at 12-23.

[76] ECF # 27 (Mues Opinion) at 4-10. The SLRO, on review, ultimately found that, while J.W. was denied transportation for the first day of school in 2005, the Winkelmans were not entitled to compensation for this denial since it did not amount to a denial of a FAPE. *See*, *id*. at 10. This overruled the award made by the IHO for denied transportation.

**D.      2006-07 school year**

Like the preceding two school years, the facts pertaining to the 2006-07 school year were found by the IHO[77] and are not disputed here, although disagreements with some of the conclusions drawn from those facts form the essence of the Winkelmans' case before the state hearing and review officers, as well as in this Court.  The facts as found by IHO Taich during some 11 days of testimony from 20 witnesses – testimony contained in a transcript of over 2, 800 pages[78] – are set forth immediately below.

Prior to the start of the 2006-07 school year, and after having attended Monarch for the preceding school year, the staffs from Monarch and Parma jointly re-evaluated J.W.[79] The team concluded that J.W. remained eligible for special education services because of autism.[80]   Accordingly, based on the evaluation and the determination of continuing eligibility, an IEP planning meeting was set for June 5, 2006.[81]  Monarch, as well as Parma, prepared a draft IEP in advance of the meeting.[82]

---

[77] *See*, ECF # 27 (IHO Taich Opinion).  Unlike the IHO in the preceding case, IHO Taich in this case did not present his factual findings in enumerated paragraphs but rather as a narrative with citations to the record.

[78] *Id*. at 6.

[79] *Id*. at 16. The evaluation also included input from two private physicians who were treating J.W.  However, neither physician testified before the IHO, and IHO Taich ultimately found their reports and evaluations of J.W. not to be reliable or credible.  *Id*.

[80] *Id*. at 17.

[81] *Id*.

[82] *Id*. at 18.

-14-

At the June 5 IEP meeting, which took place in Parma and was attended by 17 individuals representing all parties,[83] Parma presented its draft IEP, which it assembled after reviewing Monarch's draft.[84]  During the five-hour meeting,[85] the parties attempted to harmonize the various drafts, achieving "agreement for the most part with regard to each goal and objective and the present levels of [J.W's] performance."[86]  Notwithstanding that the IEP teams came to "agree[] on most areas of the IEP,"[87] the meeting concluded without a final agreed-upon IEP.[88]  Nor did agreement exist on a transition plan for J.W. to move from school at Monarch to attending Pleasant Valley.[89]  J.W. began the school year at Monarch.[90]

By December of 2006, however, J.W. was no longer attending Monarch, but was being educated at home.[91]  In light of such circumstances, Parma contacted the Winkelmans to discuss enrolling J.W. in Parma and to develop a transition plan for his adjustment to

---

[83] *Id.* at 17.  All participants are listed here, with each one's relationship to the student described.

[84] *Id.* at 18.

[85] *See*, ECF # 46 at 16.

[86] ECF # 27 (Taich Opinion) at 19.

[87] *Id.*

[88] *Id.*

[89] ECF # 46 at 17.  I again note that where a citation here is made to a brief of one of the parties for a factual statement, the citation is to the information in the brief that itself cites to a portion of the state record.

[90] *Id.*

[91] *Id.*

Parma.[92]  Parma then prepared a draft transition plan, which contemplated a transition by J.W. from his home to school in Parma.[93]

In response, the Winkelmans insisted that J.W. first be re-admitted to Monarch and then transitioned to Parma from there.[94]  Parma, in turn, starting from the premise that because J.W. was no longer attending Monarch and had been educated at home for several months, continued to propose that J.W. transition directly from home rather than after re-admission to Monarch.[95]  Before these transition issues could be addressed and resolved, however, the Winkelmans re-enrolled J.W. at Monarch and no further transition discussions, or IEP meetings, took place.[96]

## Analysis

### A.    Overview of the IDEA and judicial review thereunder

As Judge Nugent recently noted in another case, the IDEA is premised on the basic concept that, in exchange for federal funding, states are to give all children with disabilities who reside within the state a free appropriate public education [FAPE].[97]  To provide a

---

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.* at 18.

[97] *Amherst Exempted Vill. Sch. Dist. Bd. of Educ. v. Calabrese*, Case No. 1:07-cv-920, 2008 WL 2810244, at *10 (N.D. Ohio July 21, 2008) (Nugent, J.), citing *Burilovich ex rel. Burilovich v. Bd. of Educ. of the Lincoln Consol. Sch.*, 208 F.3d 560, 565 (6th Cir. 2000).

FAPE, schools must give children with disabilities "special education and related services designed to meet their unique needs" in the least restrictive environment.[98]

An IEP serves as the primary mechanism for delivering a FAPE to disabled students.[99] An IEP is created "to meet the unique educational needs of a disabled child by describing how that child learns and detailing the educational services and instruction that will help the student learn more effectively."[100]

Significantly, an IEP is not required to "maximize the potential of each handicapped child commensurate with the opportunity provided nonhandicapped children.  Desirable though that goal may be, it is not the standard that Congress imposed on the states...."[101] Rather, as the Supreme Court found in *Rowley*, disabled children are guaranteed a "floor of opportunity" consisting of access to individualized instruction and related services provided through an IEP "sufficient to confer some educational benefit upon the handicapped child."[102]

The IDEA imposes procedural requirements upon schools in providing a FAPE under an IEP.  In particular, federal IDEA regulations provide for meetings at least annually to develop and review a student's IEP.[103]  One or both of the disabled student's parents "should"

---

[98] 20 U.S.C. § 1400(d).

[99] 20 U.S.C. § 1414; *Board of Educ. v. Rowley*, 458 U.S. 176, 181-82 (1982).

[100] *Pohorecki v. Anthony Wayne Local Sch. Dist.*, Case No. 3:08-cv-1709, 2009 WL 2232202, at *3 (N.D. Ohio, July 23, 2009) (Zouhary, J.), citing 34 C.F.R. § 300.320.

[101] *Rowley*, 458 U.S. at 200.

[102] *Id.* at 201.

[103] *Amherst Exempted*, 2008 WL 2810244, at *11, citing 34 C.F.R. § 300.343.

participate in these meetings.[104]  An IEP meeting, however, may nevertheless go forward without a parent in attendance if the school district cannot convince the parents that they should attend and can document its attempts to arrange a meeting.[105]

The IDEA provides a process for parents with a complaint about any matter related to their disabled child's FAPE to seek relief.  Initially, upon the filing of a complaint with the school district alleging a deficiency in providing a FAPE to a given child, the parties must conduct a preliminary meeting to try to resolve the issue.[106]  If the complaint remains unresolved after the preliminary meeting, the parents may request "an impartial due process hearing" before either the state educational agency or the local educational agency.[107]

At such a hearing, the hearing officer "may only determine whether a child received a FAPE."[108]  To that end, a hearing officer may find that a child did not receive a FAPE only if, as the result of a procedural deficiency by the school district:

> (1)     the child was impeded in his right to receive a FAPE,

---

[104] *Id.*, citing 34 C.F.R. § 300.344.

[105] 34 C.F.R. § 300.345(d).  As Parma observes, *see*, ECF # 46 at 32 n.16, this is the C.F.R. section in force during the period at issue here.  This provision is now at 34 C.F.R. § 300.322 and has been here since 2006.

[106] *Amherst Exempted*, 2008 WL 2810244, at *11, citing 20 U.S.C. § 1415(f)(1)(B)(ii)(IV).

[107] *Id.*, citing 20 U.S.C. § 1415(f).

[108] *Id.*

    (2)     the parents were impeded in their right to participate in the decisionmaking process regarding the provision of a FAPE to their child, and

    (3)     the procedural defect caused a deprivation of educational benefits to the child.[109]

If the local educational agency conducts the due process hearing, parents dissatisfied with the result of that hearing may have an impartial state level review of that decision by a hearing officer from the state educational agency.[110]  Finally, any party aggrieved by a decision of the state level review officer may then file a civil action in federal district court.[111]

## B.    Standard of review –  judgment on the administrative record

The relevant statute[112] provides that, when conducting a judicial review of a state administrative due process hearing, the reviewing federal district court:

"(i)    shall receive the records of the administrative proceedings;

"(ii)    shall hear additional evidence at the request of a party; and

"(iii)    basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."

---

[109] *Id.*, citing 20 U.S.C. § 1415(f)(3)(E)(ii).

[110] *Id.*, citing 20 U.S.C. § 1415(g).

[111] *Id.*, citing 20 U.S.C. § 1415(i)(2).

[112] 20 U.S.C. § 1415(1)(2)(C).

In the context of reviewing an administrative decision made under the IDEA, courts have employed a "modified de novo" standard of review.[113]  As the Supreme Court stated in *Rowley*, under this standard the reviewing court should make "independent decisions" as to the issues raised based on the preponderance of the evidence while giving "due weight" to the determinations made during the state administrative proceedings.[114]

The Sixth Circuit teaches that the interplay between the federal reviewing court's obligations to make an independent determination and also to give "due weight" to the state adjudication means first that the federal court "cannot simply adopt the state administrative findings without an independent re-examination of the evidence."[115]  But, in that re-examination, "due weight" should be given to the state's findings, with the greater or lesser weight attaching depending on whether the matter under review is procedural or substantive, and whether educational expertise is essential to the finding.[116]

Essentially, as stated by the Sixth Circuit in *Nack v. Orange City School District*,[117] under a modified *de novo* review, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some

---

[113] *Rowley*, 458 U.S. at 206.

[114] *Id.*

[115] *Burilovich*, 208 F.3d at 566.

[116] *Id.*

[117] *Nack v. Orange City Sch. Dist.*, 454 F.3d 604 (6th Cir. 2006).

-20-

deference to the fact findings of the administrative proceedings, particularly when educational expertise is essential to the findings."[118]

Stated differently, this modified *de novo* review involves the application of a two-part standard – the first, procedural and the second, substantive.  As formulated by the Sixth Circuit in *Deal v. Hamilton County Board of Education*,[119] the reviewing court applies this two-part standard as follows:

> First, the court must determine whether the school system has complied with the procedures set forth in the IDEA.  Second, the court must assess whether the IEP developed through those procedures was reasonably calculated to enable the child to receive an educational benefit.[120]

"If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."[121]

With respect to the first prong – a review of procedures – the Sixth Circuit in *Burilovich ex rel. Burilovich v. Board of Education* held that "a court should strictly review an IEP for procedural compliance, although technical deviations will not render an IEP invalid."[122]  Indeed, a finding of a procedural violation does not compel the conclusion that

---

[118] *Id.* at 609, quoting *N.L. ex rel. Ms. C v. Knox County Sch.*, 315 F.3d 688, 692 (6th Cir. 2003).

[119] *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004).

[120] *Id.* at 853-54.

[121] *Rowley*, 458 U.S. at 207.

[122] *Burilovich*, 208 F.3d at 566 (internal quotation marks omitted).

the student was thereby denied a FAPE.[123]  Only if a procedural violation has resulted in substantive harm will it then constitute a denial of a FAPE.[124]

With respect to the review for substance, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review."[125] Administrative findings that an IEP was reasonably calculated to provide educational benefits should be set aside on review "only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise. a fair estimate of the worth of that testimony, or both."[126] The reviewing court should defer to substantive findings "only when educational expertise is relevant to those findings and the decision was reasonable."[127]

Parents initiating a due process hearing challenging an IEP have the burden of proving their case by a preponderance of the evidence.[128]  If they do not meet that burden, they will not be entitled to relief.[129]

_____

[123] *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001) (citation omitted).

[124] *See*, *Nack*, 454 F.3d at 609, citing *Knable*, 238 F.3d at 764.

[125] *Burilovich*, 208 F.3d at 567.

[126] *Id.*

[127] *Id.*

[128] *Nack,* 454 F.3d at 609 (citation omitted).

[129] *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *Pohorecki*, 2009 WL 2232202, at *5, citing *Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 460-61

**C.     The 2004-05 school year**

The Winkelmans allege two related errors by the SLRO concerning the 2004-05 school year.  Essentially, the Winkelmans argue that Parma denied J.W. a FAPE (1) when it did not have an IEP in place at the beginning of that school year, and (2) when it denied them a meaningful opportunity to participate in the IEP process for that year.  The SLRO decision, which relied heavily on the fact that Parma made multiple attempts to involve the Winkelmans in preparing an IEP, basically concluded that, even if Parma was obligated to have an IEP for J.W. in place as of the first day of school, Parma "made reasonable and numerous efforts to secure [the Winkelmans'] attendance at the IEP meeting and committed no error."[130]

I note initially that the parties have extensively argued whether the statute and regulations require a school district to have an IEP in place for every student by the beginning of the school year, regardless of whether the student is attending or considering attending public school or not.[131]  In contrast, the IHO, in a single sentence and citing a single regulation,[132] found that because J.W. was parentally-placed in private school, Parma was under no obligation to have an IEP in place at the beginning of the 2004-05 school year

---

(6th Cir. 1993).

[130] ECF # 27, SLRO Mues Opinion at 5.

[131] *See*, ECF # 44-4 at 18-20 (the Winkelmans); ECF # 46 at 21-24 (Parma).

[132] ECF # 22 (Mazzola Opinion) at 27-28, citing 34 C.F.R. § 300.148.

-23-

without a request for one by his parents.[133]  The SLRO did not directly address this question. Rather, the SLRO – and, indeed, the IHO – concentrated on whether, in light of the facts, J.W. was denied a FAPE when the parties did not go forward with an IEP meeting in the first month of the school year.

In that regard, the IHO, in particular, observed that, regardless of the differing interpretations of the statute and regulations concerning a district's responsibility for creating an IEP for a student parentally-placed in private school, resolving that question here was essentially unnecessary since, on the facts, Parma did have an obligation to prepare an IEP for J.W. for 2004-05 because his parents, by their actions, had triggered that responsibility.[134] Parma did not dispute this conclusion, which is the foundation for the IHO's resulting analysis that the SLRO affirmed.

Accordingly, I, too, recommend that it is unnecessary to resolve whether an obligation exists in the statute or regulations to have an IEP in place at the first day of school for a child parentally-placed in private school since in this case, as the IHO found, Parma was under an obligation to prepare an IEP for J.W. by the first day of school by virtue of the Winkelmans' actions.

That said, the issue, as it was formulated by the IHO, is whether the acknowledged failure by Parma to have an IEP in place at the start of the 2004-05 school year denied J.W.

---

[133] *Id.*

[134] *Id.* at 28.

a FAPE.  For the following reasons, I recommend finding, as did the IHO and SLRO, that it did not.

I observe first that the IHO found that, prior to the beginning of school, Parma sent two letters – on May 27, 2004 and again on June 15, 2004 – to the Winkelmans, "offering to hold IEP meetings, to which it received no answer."[135]  Again, the Winkelmans' arguments relating to these findings does not deny that the correspondence took place, or that they did not respond, but merely contends that the communications should be summarized or construed differently.  In the context of these motions, however, reshaping the summary of the correspondence does not alter the fact that it took placed, nor that the Winkelmans' response, or lack thereof, was what it was.  Thus, given that these invitations and failures to respond were well before the start of the school year, the IHO then directly concluded that "had [the Winkelmans] responded, [that response] likely would have led to an IEP being in place on the first day of the school year."[136]

This finding by the IHO provides a crucial predicate for what follows. Quite apart from whatever else may be established, or established more precisely, by the events surrounding the scheduling, re-scheduling and holding of an IEP meeting after school had already begun, the Winkelmans here do not contest that Parma twice communicated with them in some fashion before the start of school offering to meet with them about an IEP for

---

[135] *Id.*

[136] *Id.*

-25-

J.W. and that those communications generated no response.[137]  Nor, significantly, do the Winkelmans here take issue with the conclusion drawn by the IHO from these facts, that had they responded to Parma's pre-school year communications, it is likely that there would have been an IEP in place at the start of the school year.

While the Winklelmans correctly note that a parental failure to participate in an IEP meeting cannot, of itself, absolve a district of an otherwise existing responsibility to create an IEP,[138] nor, of itself, constitute a waiver of other parental rights under the statute,[139] such non-cooperation by a parent has been seen as troubling by some courts that perceive it to be, at least potentially, playing "a game of gotcha" with the district.[140]  The IHO expressed that concern here by observing that, if Parma had gone forward prior to the start of the school year with preparing an IEP without attempting to involve the Winkelmans, Parma would have faced "the same problem [the Winkelmans] allege [relates to] the September 20, 2004 IEP – it would have lacked parental involvement."[141]

---

[137] The Winkelmans do argue, and Parma does not disagree, that these two letters, which they characterize as mere "informal letter[s] from a school district employee," did not conform to the mandatory form for notice of a formal IEP meeting.  ECF # 47 at 6.

[138] ECF # 47 at 6.

[139] *Id.*

[140] *See*, *School for the Arts in Learning Pub. Charter Sch. v. Johnson*, 2006 WL 1000337, at * 5 (D.D.C. 2006).  The court here noted that it was "very troubled" by the possibility of a parent "fail[ing] to respond on a timely basis to a charter school's request for an annual IEP team meeting and then successfully su[ing] the charter school for not implementing a new IEP that had not been reviewed by [the parent]."

[141] ECF # 22 (Mazzola Opinion) at 28.

Against this background, the IHO factually concluded that, while Parma had an obligation to prepare an IEP,[142] it was the Winkelmans who bore responsibility for "much of the delay" in preparing a *timely* IEP, such that "no actionable violation" of the IDEA can be established against Parma[143] simply because an IEP did not exist on the first day of school in 2004.[144]  Although the Winkelmans here attempt to read the statute as imposing a form of strict liability on a district that missed having an IEP in place by even a single day, regardless of how that delay came about or who was principally responsible, they have pointed to no case authority for such a rule.

In sum, I recommend finding that the SLRO's decision that Parma's failure to have an IEP in place at the beginning of the school year did not, of itself, deny J.W. a FAPE was

---

[142] The IHO was very careful to find that Parma's obligation, as previously stated, indisputably sprang from the Winkelmans' desire that such an IEP be created, which desire triggered the obligation as stated in the Sixth Circuit's decision in *James ex rel. James v. Upper Arlington City Sch. Dist.*, 228 F.3d 764, 766-69 (6th Cir. 2000).  The IHO was particular in not offering a view as to whether the Winkelmans' interpretation of the statute and regulation, or Parma's position, was correct as to what obligation, if any, would exist apart from such a request.  As previously stated, I recommend following the IHO by not addressing the various statutory construction arguments presented here on the grounds that to do so is unnecessary: an obligation to create an IEP existed and that obligation was rooted in the Winkelmans' request for one.

[143] The IHO did find Parma procedurally violated the IDEA in conducting the September 20, 2004 IEP meeting without the Winkelmans.  ECF # 22 (Mazzola Opinion) at 34.  However, the IHO also found that this technical violation did not significantly affect the Winkelmans' right to participate in the IEP formulation.  *Id*. at 35.  The SLRO, by contrast, reversed the finding of a procedural violation.  ECF # 27 (Mues Opinion) at 5.

[144] ECF # 22 (Mazzola Opinion) at 28.

-27-

not erroneous.   Specifically, the Winkelmans have not shown, as they would need to, that any substantial harm flowed from the lack of an IEP under the circumstances.

**D.    The 2005-06 school year**

*1.    The one-day failure to provide bus transportation services as the denial of a FAPE*

The gravamen of the Winkelmans' objection here is that the SLRO erred in not finding a denial of a FAPE in Parma's failure to provide bus transportation to J.W. for one day at the beginning of the 2005-06 school year.  The Winkelmans argue that since J.W.'s IEP included a requirement that he be provided transportation to school by Parma, and further that, since such transportation was not provided "at the start of the school year," such a failure to implement a part of the IEP must "constitute[] a substantive, rather than procedural" infraction, resulting in "a *per se* denial of FAPE" requiring the court to employ its "broad equitable power" to award compensation for the full year's tuition at Monarch.[145]

SLRO Mues relied for his finding that no denial of a FAPE occurred here on the fact that, although Parma did not send a bus for J.W. on the first day of school, it "immediately attempted to correct its error and sent a bus the following day.  [The Winkelmans refused to place J.W. on that bus.]"[146]

I note here, as does Parma, that the issue of whether the absence of transportation for one day was procedural or substantive is not determinative.[147]  Rather, as was recognized by

---

[145] ECF # 44 at 22.

[146] ECF # 27 (Mues Opinion) at 9.

[147] ECF # 46 at 36.

-28-

the state review officers, the question is whether this violation of the IEP, as with any other, operated to deny the student a FAPE.[148]   On these facts, I recommend finding that the Winkelmans have not shown that a one-day lacunae in the provision of bus transportation caused substantive harm.

The Winkelmans' central argument to the contrary – that Parma's belated offer of a transportation plan caused substantive harm because it came too late, *e.g.*, after the Winkelmans had signed a year's tuition agreement with Monarch – is unpersuasive.  Even if one accepts, with difficulty, the initial premise that the failure of the bus to arrive on the first day would necessarily compel the Winkelmans to immediately sign a full year's tuition arrangement with a private school as the only logical response to that single missed pickup,[149] it does not follow that, once signed, such an enrollment agreement was totally immutable in the face of any conceivable future modifying circumstance.

Simply put, there is nothing here – either in the facts or law – to support a finding that no possible remedial action by Parma, no matter how swiftly taken nor how comprehensive, would relieve Parma from an obligation to pay a full year's tuition for Monarch once Parma missed that first bus pickup on the first day.  In this sense, the concerns expressed by the SLRO about a perceived attempt to leverage this one-time failure to provide transportation

---

[148] *Nack*, 454 F.3d at 609.

[149] I note here that the record does show that the Winkelmans had previously used Monarch on a month-to-month basis, thus creating the reasonable supposition that such an arrangement was possible here.

-29-

into mandatory reimbursement for a full year's tuition should, I submit, weigh against the Winkelmans in the event this Court needs to balance the equities of this situation in the exercise of its broad equitable powers of remedy.

## 2. *The denial of any compensation for missed transportation*

Related to the immediately preceding issue, this claim asserts that the SLRO erred in changing the IHO's decision that Parma denied J.W. transportation for nine days, not one, and further erred in concluding that even the one day when transportation was not provided did not constitute a compensable denial of a FAPE.

Here, the Winkelmans again contend that the true cost of not having transportation on the first day of school was that they were "required" to enroll J.W. at Monarch for the full year.[150]  They argue that even the nine days of compensation awarded by the IHO was incorrect, since Ohio regulations provide that in cases where the public school district has not made a FAPE available in a timely manner prior to that child's enrollment in an appropriate nonpublic school, the public school may be required to reimburse the parents for the cost of that enrollment.[151]

I observe the denial of a FAPE triggers any reimbursement under this provision – something the SLRO determined did not occur simply by the failure to send the bus the first day.  While the one-day default may technically have violated the IEP, which called for

---

[150] ECF # 44 at 23.

[151] *Id.*, citing O.A.C. § 3301-51-02(L)(3).

-30-

providing transportation, only such violations of an IEP that also cause substantial harm will constitute a denial of a FAPE. Thus, the Winkelmans' use of the specific cited regulation here essentially relies on a fact not established.

Consistent with the analysis in the foregoing section, I recommend finding that because no denial of a FAPE took place as a result of the one-day absence of transportation, no error occurred in finding, as did the SLRO, that no compensation for lost transportation should be awarded. The key issue, in other words, is not whether compensation should be based on the loss of a bus for one day or nine, but whether the SLRO correctly concluded that the one-day failure to send the bus did not deny J.W. a FAPE. Having concluded, as described above, no denial of a FAPE took place under these circumstances, it follows that the Winkelmans should receive no reimbursement for transportation or enrollment costs under the regulations.

**E.     The 2006-07 school year**

*1.     The requirement of a transition plan in the IEP*

The issue of whether Parma should have includes a transition plan in the IEP for 2006-07 is extensively argued by the parties. Parma's position – and that of the SLRO – is that the IDEA does not compel such a plan for all students moving between schools.[152] Further, Parma also argues that they were prepared to discuss transition services that may be available but that the Winkelmans – and particularly Mrs. Winkelman – were unwilling to

---

[152] ECF # 46 at 37-43.

discuss any transition plan that did not have J.W. attend a full year at Monarch, paid for by Parma, before beginning at Pleasant Valley.[153]

Indeed, the SLRO in this matter found that the Winkelmans "went through the motions" of attending an IEP meeting where transition services were to be discussed, but then "showed no inclination to work with [Parma]" on determining what, if any, transition services should be provided.[154]  The initial meeting where transition services were first introduced for discussion was taped, and the SLRO summarized the taped discussion as reflecting Parma's offer to "continue the lengthy IEP meeting at another time to discuss how to transition [J.W.], while [Mrs. Winkelman] insisted [that a] transition should take a full year."[155]  Following this meeting, the SLRO found that Parma put its offer to meet again on the subject in writing but that the Winkelmans did not respond.[156]

The Winkelmans, in turn, essentially argue that, although the IDEA may not mandate transition services – or, as they term it, "reintegration services" – in every IEP, this case required such services for J.W. to receive a FAPE, particularly because of his autism.[157] They further argue that the IHO mistakenly required the Winkelmans to prove J.W.'s need for transition or reintegration services by "clear and convincing" evidence rather than merely

---

[153] *Id.* at 39-40.

[154] ECF # 27 (Bohlen Opinion) at 29.

[155] *Id.* at 30.

[156] *Id.*

[157] ECF # 44 at 23-28.

by a "preponderance" of the evidence.[158]  In addition, the Winkelmans contend that because Parma impermissibly made further discussion of a transition plan contingent on J.W. enrolling at Pleasant Valley, no actual transition plan ever existed in this case, making the corresponding IEP not appropriate.[159]

I observe initially, as the parties themselves appear to agree, that no statute or regulation requires that every child subject to IDEA, transitioning between education settings, have a specific transition plan as part of the IEP regardless of any proven individual need for such a plan.  The IDEA, however,  does require that if transition services are shown to be needed to permit the child to receive an educational benefit from a proposed IEP, then the IEP must provide for such transition services for the child to receive a FAPE.[160]

Thus, the issue here is whether, given the facts of J.W.'s situation, Parma was required to include specific transition services in any IEP.  The record indicates first, and the SLRO found, that Parma proceeded on the belief that some such services may be required but that no services came to be included in the IEP because the Winkelmans elected not to go forward

___

[158] *Id*. at 26, 28.

[159] ECF # 47 at 7-8, citing *A.Y. v. Cumberland Valley Sch. Dist*., 569 F. Supp. 2d 496 (M.D. Pa. 2008).

[160] *Compare*, ECF # 46 (Parma) at 8 ("A school district is not obligated to prepare a plan to transition a child from home or private school to public school unless such a plan is required to allow the child to receive an educational benefit from the proposed IEP."); and ECF # 47 (Winkelmans) at 8 ("'When a school district knows that a child requires a transition plan to return to that school district from a private school placement and that school district does not include a transition plan in the IEP, the IEP is not appropriate.'"), quoting *Cumberland Valley*, 569 F. Supp. 2d at 510.

with the process and enrolled J.W. at Monarch.[161]  Indeed, the SLRO noted Parma's readiness to continue discussing the provision of transition services when the Winkelmans "made their decision to unilaterally place [J.W.] in private school."[162]

     In brief, the issue concerning transition services essentially is whether – assuming that such services were likely necessary here – there was any denial of a FAPE when it was the Winkelmans who aborted the process of determining the elements of a transition plan with Parma before completion of such a plan so that they could enroll J.W. in Monarch. Parma contends that it would be "inequitable" to hold Parma responsible for failing to offer transition services here,[163] while the Winkelmans, relying on *A.Y. v. Cumberland Valley*,[164] a Middle District of Pennsylvania decision, argue that Parma is responsible for the lack of a transition plan – and thus denying J.W. a FAPE – because it attempted to link preparation of such a plan to the Winkelmans approving the placement of J.W. at Pleasant Valley.[165]

     I recommend finding that Parma's position is correct.  The Winkelmans present a flawed argument because the record shows that Parma did not premise the preparation of a transition plan on the Winkelmans' "approval" of a placement in Parma but merely on the Winkelmans' willingness to continue to be open to such a placement during the pendency

---

[161] ECF # 27 (Bohlen Opinion) at 28-31.

[162] *Id*. at 30.

[163] ECF # 46 at 42.

[164] *A.Y. v. Cumberland Valley Sch. Dist.*, 569 F. Supp. 2d 496.

[165] ECF # 47 at 8.

of the IEP planning.  The record is clear that the Winkelmans imposed strict conditions on continuing any discussions with Parma.  When those conditions were not met, the Winkelmans summarily aborted the proceedings.

The SLRO found specifically in this regard that Mrs. Winkelman "would not accept anything less" in transition services than having J.W. attend Monarch for a full year with tuition to be entirely reimbursed by Parma,[166] and, when it became clear that Parma would not simply acquiesce to this demand, she completely walked away from having any further talks with Parma on providing transition services under any other terms.[167]

Given, as previously noted, that particular transition services need to be established as necessary for each individual student by the entire IEP team in order to include them in the IEP and so make providing them a constituent part of a FAPE in that particular case, it is difficult to see how that process could take place in the circumstances described here. Rather than Parma impermissibly insisting on a commitment to place J.W. at Pleasant Valley prior to any evidence being placed in the record as to what transition services would be necessary and whether they could be provided, *Cumberland Valley* would seem to apply with similar force to the Winkelmans, who also attempt to short-circuit the IEP preparation process as regards ascertaining needed transition services by insisting prior to any evidence of need that only one outcome would suffice.  In both cases, under the rule in *Cumberland*

---

[166] ECF # 27 (Bohlen Opinion) at 29.

[167] *Id.*

-35-

*Valley*, neither party should be permitted to force its preferred outcome on the other from the start by contriving to avoid the process of having the IEP team evaluate, on the evidence, whether particular transition services are actually required by a particular student and so whether they should be a part of that student's IEP.

On this record, I recommend affirming the decision of the SLRO that the Winkelmans, by summarily withdrawing from any IEP planning meetings and placing J.W. at Monarch, foreclosed Parma from determining what, if any, particular transition services should have been a part of J.W.'s IEP. As such, Parma's failure, if any, to have adequate transition services in the IEP did not cause significant harm to J.W. and thus did not deny him a FAPE.

## 2. *Predetermination of J.W.'s placement or services for 2006-07*

Here, both sides rely on the Sixth Circuit case of *Deal*[168] to resolve the question of whether the SLRO erred in finding that Parma did not impermissibly predetermine either J.W.'s placement at Pleasant Valley or the particular educational services he would be provided. For the reasons that follow, I recommend affirming the conclusions of the SLRO.

Predetermination as outlined by the Sixth Circuit in *Deal* involves a finding that a school district pre-selected a particular program for a student regardless, or in spite of, that student's demonstrated individual needs.[169] As such, predetermination amounts to a procedural violation of the IDEA, which can cause substantial harm, depriving the student

---

[168] *Deal*, 392 F.3d 840.

[169] *Id*. at 855.

-36-

of a FAPE, where the student's parents are "effectively deprived" of meaningful participation in the IEP process.[170]

However, as the Sixth Circuit carefully observed in *Nack*,[171] "predetermination is not synonymous with preparation."[172]  School district officials do not engage in predetermination when they "'prepare reports [in advance of an IEP meeting] and come [to such a meeting] with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions.'"[173]

Further, as was observed in a prior case between these two parties, the predetermination found by the Sixth Circuit in *Deal* was factually grounded on an unofficial policy whereby the school district refused to consider, purely for financial reasons, certain programs regardless of the child's proven need for such programs.[174]  That is not analogous to the situation where school officials simply enter the discussions about the IEP with some pre-formed opinions or pre-drafted reports but then participate with the parents in meaningful, ongoing discussions about what the IEP should contain.[175]

---

[170] *Id.* at 857.

[171] *Nack*, 454 F.3d 604.

[172] *Id.* at 610.

[173] *Id.*, quoting *Knox County Schools*, 315 F.3d at 694.

[174] *Winkelman*, 411 F. Supp. 2d at 728-29, citing *Deal*, 392 F.3d at 855-56.

[175] *Nack*, 454 F.3d at 631.

Here, the state record is clear that, contrary to *Deal*, Parma did not have a policy to refuse to consider programs required for a child purely for financial reasons.  The Winkelmans' one attempt to create such an issue is not persuasive.  The Winkelmans argue that Parma refused to consider using a teaching method – Applied Behavioral Analysis, or ABA – that had proven successful with J.W. at Monarch.[176]  As SLRO Bohlen found, however, there is no evidence in the record that the Winkelmans every actually requested this methodology for use by Parma with J.W.[177]

In fact, the SLRO found that, far from Parma predetermining the content of the IEP, the IEP prepared for the Winkelmans by Monarch served as the starting place for the IEP team discussion, which was then discussed – with the Winkelmans' "undisputed" involvement, together with that of their representatives – over the course of five hours in a "contentious" but yet "collaborative" meeting. [178]  As the SLRO concluded, consistent with the applicable law, such a meeting does not evidence predetermination but, rather, reflects the "requirements of the IDEIA that all input is considered, not necessarily incorporated."[179]

---

[176] ECF # 44 at 28-30.

[177] ECF # 27 (Bohlen Opinion) at 28-29. The Winkelmans essentially agree that they never sought to use this methodology, but assert that since Parma didn't offer that program, it would have been pointless to mention its benefits.  "Nothing that Monarch or [the Winkelmans] could have presented at the IEP Team meeting would change that."  ECF # 44 at 30.

[178] *Id.* at 25-26.

[179] *Id.* at 26.  Indeed, as the SLRO further noted, failure to agree after input has been considered, but rejected, is "exactly what leads to due process hearings" as provided for in the IDEA.  *Id.*

In addition, the SLRO rejected the idea that a predetermination existed because Parma came to the IEP meeting with the plan to place J.W. at Pleasant Valley.  First, as the SLRO directly observed, the IDEA favors public school placements.[180]  Second, as the SLRO also directly stated, it is "a bit disingenuous" for the Winkelmans to complain that Parma came to the IEP meeting with a predetermined idea of J.W.'s placement since the Winkelmans came to the IEP meeting with their own predetermined idea to place J.W. at Monarch at Parma's expense.[181]  In fact, the SLRO concluded, on the facts of the record, that Mrs. Winkelman's "behavior during the IEP and subsequently [as to her insistence that J.W. only be placed at Monarch at Parma's expense] exemplifies the concept of predetermination."[182]

In sum, I recommend finding that the decision of the SLRO that Parma engaged in no inappropriate predetermination is supported by both the law and the evidence and that the Winkelmans have not shown a basis on which to find to the contrary.

---

[180] *Id*. at 27, citing *W.S. ex rel. C.S. v. Rye City Sch. Dist*., 454 F. Supp. 2d 134, 148 (S.D.N.Y. 2006).

[181] *Id*. at 28.

[182] *Id.*  This link between the Winkelmans' actions and the definition of predetermination set forth in *Deal* seems to rest on both being driven by financial reasons.

## Conclusion

For the foregoing reasons, I recommend that Parma's motion for judgment on the administrative record be granted, and that the Winkelmans' motion for summary judgment be denied.

Dated:   October 28, 2009                    s/ William H. Baughman, Jr.
                                             United States Magistrate Judge

## Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.[183]

---

[183] *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also*, *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).