## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **JEFFREY WINKELMAN, et al.,** | ) | **CASE NO. 1:07 CV 3860** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| | ) | **Magistrate Judge William H. Baughman, Jr.** |
| | ) | |
| **PARMA CITY SCHOOL DISTRICT** | ) | <u>**MEMORANDUM OPINION**</u> |
| **BOARD OF EDUCATION ,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the Court upon the Report and Recommendation of Magistrate

Judge William H. Baughman, Jr. (Document #49), recommending that the Court grant the

Motion for Judgment on the Administrative Record filed by Defendant Parma City School

District Board of Education (Docket #46) and recommending that the Court deny the Motion

for Summary Judgment filed by Plaintiffs Jeffrey and Sandee Winkelman (Docket #44).

The factual and procedural history of this case, as set forth by the Magistrate Judge,

is as follows:

> The underlying case involves an administrative appeal under the
> Individuals with Disabilities Education Act (IDEA) taken by the plaintiffs
> Jeffrey and Sandee Winkelman (the Winkelmans) in their capacity as parents
> of a school-aged son, J.W., who has autism. The Winkelmans, residents of
> the Parma City School District (Parma), here assert that Parma violated their

rights under the IDEA and/or those of their son in two major respects:

> (1)     that two separate decisions of State Level Review Officers
>         (SLROs) of the Ohio Department of Education erroneously
>         found that for three school years Parma did offer J.W. a free
>         appropriate public education (FAPE) as required by the IDEA;
>         and
>
> (2)     that these two decisions also improperly denied the
>         Winkelmans reimbursement for expenses incurred in
>         educating J.W. during those three years at Monarch School, a
>         private institution in Shaker Heights, Ohio.

For the reasons that follow, I will recommend that Parma's motion be granted.

### Facts

This is a well-known case with an extensive history created over many proceedings. Accordingly, there seems little value here in attempting to comprehensively summarize such a voluminous record. A brief factual review of the events relevant to this motion is appropriate, however. Of necessity, even such a review taxes the notion of brevity. Inasmuch as the individual administrative cases at issue here center on three specific school years, I will likewise group the facts presented by the individual school year at issue, beginning with some consideration of events that transpired prior to the first school year here under review.

### A. Prior events

Prior to entering school for the first time, Parma identified the Winkelmans' son, J.W., as having autism and so eligible for special education services under IDEA. Based on that determination, Parma developed an Individualized Education Program (IEP) for J.W. under which he then was enrolled in the First Step Preschool program in the Parma schools for the 2000-01 school year.

By the end of that school year, however, the IEP team responsible for J.W., which included his parents as well as Parma teachers, concluded that J.W. could no longer receive a FAPE at First Step in Parma but that he should enroll for the next year at the Achievement Center for Children (ACC), a private preschool for autistic children. Parma funded J.W.'s placement at ACC under the IDEA. Under the IEP created by Parma, J.W. attended the ACC, with his expenses paid by Parma, during the 2001-02 and 2002-03

-2-

school years, as well as during the summers of 2002 and 2003.

In the summer of 2003, however, the pre-school program at the ACC concluded and that school discharged J.W., with responsibility for his future public education returning to Parma. At this time, Parma continued to identify J.W. as disabled and eligible for special education services related to his autism. Thus, in June, 2003 the Winkelmans and Parma met to establish a new IEP for J.W. for the upcoming school year when he was presumably to attend school in Parma.

The IEP prepared for J.W. at this time, to be presented at a June 2, 2003 meeting between Parma and the Winkelmans, provided for placement in a self-contained special education classroom for K-2 students at Parma's Pleasant Valley Elementary School. The Winkelmans, however, disagreed with that placement and with the IEP. They immediately filed a due process complaint with a request that, pending completion of the due process hearing, J.W.'s stay-put placement should either remain the ACC preschool or, alternatively, change to the Monarch School in Shaker Heights, another private institution. While the Winkelmans' due process hearing request pended, J.W. continued to attend the ACC preschool on an extended summer schedule, and Parma continued to pay the expenses.

The IEP offered by Parma for 2003-04 was found by both the state hearing officers and by this Court17 to provide J.W. with a FAPE. However, that IEP was never implemented since J.W. was never enrolled in Parma for that year. Instead, the Winkelmans elected prior to the start of the school year to enroll J.W. in Monarch School.

As noted, these prior events, while useful for context, are merely prologue to the circumstances giving rise to the present action. Those events will, as mentioned, be grouped below according to the relevant school year at issue.

**B. 2004-05 school year**

The pertinent events of the 2004-05 school year as concern this case need to be understood in light of the Winkelmans two basic arguments arising out of this year and Parma's responses. For the Winkelmans, 2004-05 is a year that:

      (1)     the district did not have an IEP in place for J.W. at the start of that year, and

      (2)     the district denied them a meaningful opportunity to participate in creating an IEP.

For Parma, 2004-05 is characterized by:

(1)     the Winkelmans' refusal to participate in any meetings
        arranged by Parma prior to the school year to create an IEP
        and then,

(2)     after such refusals, playing "gotcha" with the district by
        attacking Parma for not having an IEP in place at the start of
        the school year.

Notwithstanding the opposing characterizations, the essential
underlying facts appear undisputed.

On May 27, 2004, prior to the beginning of the 2004-05 school year,
Parma sent the Winkelmans a letter requesting attendance at an IEP meeting
to "review J.W.'s progress and develop an IEP for the 2004-2005 school
year." The Winkelmans did not respond to this letter. On July 15, 2004,
approximately two months after the first letter and also prior to the beginning
of the school year, Parma sent the Winkelmans a second letter "requesting
that the Winkelmans meet with [Parma] to consider the educational program
available at Parma." Once again, the Winkelmans did not respond to Parma's
letter.

The school year then began on August 23 with three significant,
undisputed events:

(1)     Parma did not have an IEP in place for J.W.;

(2)     Parma received a federal court order that day affirming a
        decision of an Ohio SLRO that Pleasant Valley School in
        Parma was J.W.'s stay-put placement despite the Winkelmans
        having previously requested an order designating Monarch
        School as J.W.'s stay-put placement; and

(3)     Parma did not send a bus for J.W. on the first day of school.

Upon receiving notice on August 24 confirming J.W.'s stay-put
placement at Pleasant Valley, Parma sent yet another letter to the
Winkelmans inviting them to attend a "preliminary IEP meeting" on
September 2, as well as "a formal 'Parent Invitation' to the IEP meeting."

Within days of this invitation, the Winkelmans filed a due process
request alleging denial of a FAPE because Parma did not have an IEP in place

-4-

on the first day of school and asked Parma to reschedule the IEP meeting. Parma, in response to the Winkelmans' request to reschedule, sent the Winkelmans a second parent invitation, proposing to have the IEP team meeting on either September 13 or 15. That invitation included a draft IEP for the Winkelmans to review.

A few days later, Mrs. Winkelman asked Parma to reschedule the IEP meeting, proposed for either September 13th or 15th, to the 20th. Parma agreed and thereupon mailed the Winkelmans a third invitation to an IEP meeting, now rescheduled for the 20th. Mrs. Winkelman responded to Parma's third invitation to an IEP meeting by notifying Parma that the Winkelmans now wanted the IEP meeting planned for the 20th moved to an unspecified future date so that all parties could know how the IHO had ruled on their request for a stay-put order concerning J.W.– a decision the Winkelmans expected to be issued either the 20th or 21st. Parma never responded to this letter.

During the morning of the 20th and prior to the originally scheduled IEP meeting, the IHO issued the stay-put order finding that Pleasant Valley in Parma was J.W.'s stay-put placement. When Parma's attempt that day to contact the Winkelmans about proceeding with the meeting did not succeed, Parma decided to go forward with the meeting as scheduled without the Winkelmans. Accordingly, those present prepared an IEP for J.W. at that meeting. The members of the IEP team from Parma signed the IEP, and Parma transmitted it to the Winkelmans on September 21, along with a written notice of what transpired at the meeting and an invitation to meet again to review the plan.

The Winkelmans made no direct response to these communications and "did not ask to revisit the September 20, 2004 [IEP] pursuant to [Parma's] invitation." Instead, in correspondence dated the 20th – which, as noted, is the date of the order confirming J.W.'s stay put placement as Pleasant Valley, as well as the date the IEP meeting was held – Mrs. Winkelman informed Parma that she would be "'providing educational services for J.W. at home.'"

After this representation, Parma, on September 24, notified the Winkelmans of its withdrawal of the prior written notice communication about the IEP and informed them of the home schooling requirements applicable to J.W.44 Within two weeks, Parma sent the Winkelmans yet another letter about home schooling, which included information as to J.W.'s attendance record and another copy of the home schooling requirements. The Winkelmans did not contemporaneously respond to these communications nor did they file an application to have J.W. home schooled.

Despite a brief exchange of emails in November 2004, apparently generated in response to another request by Parma for information as to

where J.W. was being educated, the Winkelmans did not apply to have J.W. home schooled during the 2004-05 school year. In the end, the Winkelmans did not enroll J.W. at Parma. Rather, working with the assistance of the Monarch School, they educated him at home during the 2004-05 school year.

## C. 2005-06 school year

On July 28, 2005, in advance of the 2005-06 school year, Parma sent a letter to the Winkelmans inviting them to an IEP meeting on August 18 for the forthcoming school year. In advance of that meeting, Mrs. Winkelman provided Parma with information as to J.W.'s current educational performance.

At the lengthy IEP meeting on August 18 – which was attended by the Winkelmans and team members from Parma – Parma presented a draft IEP, which was then discussed, and numerous changes made.  At the conclusion of the meeting, the Winkelmans signed the IEP as only participants.

As this IEP meeting was concluding, however, the Winkelmans expressed an interest in using the Autism Scholarship Program (ASP). During an ensuing discussion about the ASP, a disagreement surfaced as to whether parents qualified for the program if litigation over any previous IEP remained pending. The Ohio Department of Education was immediately contacted by phone to clarify the eligibility rules for the ASP.  Upon being told by a state official that "a student was only eligible for the ASP if there was no litigation pending concerning any IEP that had been developed for the child," the Winkelmans "abruptly left the meeting," professing their disagreement with this position.

In addition, "[b]ecause the meeting ended abruptly, documents necessary to implement related transportation services were not completed at the end of the meeting."  Moreover, in "the confusion caused by the contentious end to the [IEP] meeting," Parma "wasn't sure whether or not [the Winkelmans]" had agreed to the IEP and so "assumed without confirming" that J.W. would not be attending Pleasant Valley in the upcoming year.  Significantly, this confusion by Parma about the Winkelmans' intentions as to enrolling J.W. at Pleasant Valley also caused Parma to make no arrangement for bus transportation for J.W. for the first day of school.

Given this history, on August 23, the first day of school, Parma did not send a bus for J.W, ironically despite the fact that the Winkelmans had themselves decided to "put J.W. on the bus to Pleasant Valley" pending a determination of their ASP request. Instead, the Parma superintendent phoned Mrs. Winkelman on the first day of school to say that the IEP discussed at the August meeting was not being implemented because it had not been agreed to.  Mrs. Winkelman thereupon took J.W. to Monarch that afternoon.

Parma did send a bus for J.W. the next day, but Mrs. Winkelman refused to put J.W. on that bus. Instead, the next day the Winkelmans informed Parma that, for the 2005-06 school year, "'J.W. will be attending Monarch school at the public expense.'"

A few months later, the Winkelmans, who ultimately did not succeed in obtaining a state autism scholarship for the school year, told Parma in November, 2005, that they were withdrawing approval of J.W.'s IEP for that year.72 In the end, J.W. did not attend Pleasant Valley but, rather, attended Monarch74 and so the 2005-06 IEP developed with Parma was never implemented.

At the close of this school year, the Winkelmans filed a due process complaint, which is under review here, alleging that Parma had denied J.W. a FAPE for school years 2004-05 and 2005-06. The IHO ruled for Parma and against the Winkelmans concerning both school years, and these decisions were later substantially affirmed by the SLRO.

**D. 2006-07 school year**

Like the preceding two school years, the facts pertaining to the 2006-07 school year were found by the IHO77 and are not disputed here, although disagreements with some of the conclusions drawn from those facts form the essence of the Winkelmans' case before the state hearing and review officers, as well as in this Court. The facts as found by IHO Taich during some 11 days of testimony from 20 witnesses – testimony contained in a transcript of over 2, 800 pages78 – are set forth immediately below.

Prior to the start of the 2006-07 school year, and after having attended Monarch for the preceding school year, the staffs from Monarch and Parma jointly re-evaluated J.W. The team concluded that J.W. remained eligible for special education services because of autism. Accordingly, based on the evaluation and the determination of continuing eligibility, an IEP planning meeting was set for June 5, 2006. Monarch, as well as Parma, prepared a draft IEP in advance of the meeting.

At the June 5 IEP meeting, which took place in Parma and was attended by 17 individuals representing all parties, Parma presented its draft IEP, which it assembled after reviewing Monarch's draft. During the five-hour meeting, the parties attempted to harmonize the various drafts, achieving "agreement for the most part with regard to each goal and objective and the present levels of [J.W's] performance." Notwithstanding that the IEP teams came to "agree[] on most areas of the IEP," the meeting concluded without a final agreed-upon IEP. Nor did agreement exist on a transition plan for J.W. to move from school at Monarch to attending Pleasant Valley. J.W. began the school year at Monarch.

By December of 2006, however, J.W. was no longer attending Monarch, but was being educated at home. In light of such circumstances, Parma contacted the Winkelmans to discuss enrolling J.W. in Parma and to develop a transition plan for his adjustment to Parma then prepared a draft transition plan, which contemplated a transition by J.W. from his home to school in Parma.

In response, the Winkelmans insisted that J.W. first be re-admitted to Monarch and then transitioned to Parma from there. Parma, in turn, starting from the premise that because J.W. was no longer attending Monarch and had been educated at home for several  months, continued to propose that J.W. transition directly from home rather than after re-admission to Monarch. Before these transition issues could be addressed and resolved, however, the Winkelmans re-enrolled J.W. at Monarch and no further transition discussions, or IEP meetings, took place.

Report and Recommendation of Magistrate Judge Baughman at pp. 2-16.

On October 28, 2009, the Magistrate Judge issued his Report and Recommendation, recommending that the Court grant the Motion for Judgment on the Administrative Record filed by Defendant Parma City School District Board of Education and deny the Motion for Summary Judgment filed by Plaintiffs Jeffrey and Sandee Winkelman.

On November 11, 2009, Plaintiffs filed their Objections to the Report and Recommendation. (Docket #50.)  Plaintiffs object to the findings of the Magistrate Judge. Specifically, Plaintiffs argue the following:

- The Magistrate Judge erred in assuming that a school district has reciprocal rights under IDEA;

- The Magistrate Judge erred in finding no denial of FAPE where the school district failed to have a program in place at the start of the 2004-2005 school year;

- The School District denied the parent a meaningful opportunity to participate in the IEP process during the 2004/05 school year, thus denying J.W. a FAPE;

- The Magistrate Judge improperly deemed the failure to provide IEP services during 2005/06 as harmless;

- The SLRO erred in failing to correct the inadequate relief provided by the

hearing officer for 2005/06;

- The Magistrate Judge erred in finding that IDEA does not require transition services in this case; and,

- The School District improperly predetermined the program and methodology it offered to J.W.

### Standard of Review for a Magistrate Judge's Report and Recommendation

The applicable district court standard of review for a magistrate judge's report and recommendation depends upon whether objections were made to the report. When objections are made to a report and recommendation of a magistrate judge, the district court reviews the case *de novo*. FED. R. CIV. P. 72(b) provides:

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

### Conclusion

The Court has reviewed the Report and Recommendation *de novo*, as well as the Objections to the Report and Recommendation filed by Plaintiffs. The Magistrate Judge meticulously analyzed the conduct of all parties involved in this litigation, and all other relevant facts, and thoroughly, comprehensively and fairly evaluated each of the complex legal issues before the Court.

The Court finds it important to emphasize the great pains Defendant Parma City School District Board of Education went through to comply with the complex laws that govern these issues, expending a great deal of time and effort while experiencing continued difficulties with the cooperation of Plaintiffs. The Court finds the objections of Plaintiffs to the Report and Recommendation to be without merit. The Court need not reiterate the analysis of the Magistrate Judge, which clearly and thoughtfully addresses all of the issues in

this case. The Court hereby agrees with, and adopts, the findings and conclusions of the
Magistrate Judge as its own.

Based on the foregoing, the Court hereby GRANTS judgment in favor of Defendant
Parma City School District Board of Education on the administrative record (Docket #46)
and DENIES the Motion for Summary Judgment filed by Plaintiffs Jeffrey and Sandee
Winkelman (Docket #44). This case is hereby TERMINATED.

IT IS SO ORDERED.

DONALD C. NUGENT
United States District Judge

DATED: November 30, 2009